NEW YORK CENTRAL RAILROAD COMPANY *v.* NORTHERN INDIANA PUBLIC SERVICE COMPANY.

[No. 20,209. Filed November 28, 1966. Rehearing denied December 30, 1966.]

*Owen W. Crumpacker, Harold Abrahamson,* and *Crumpacker, Burbach & Abrahamson,* of Hammond, *Bowen, Myers, Northam and Given,* of Indianapolis, and *Richard O. Olson,* of Chicago, for appellant.

*George Douglas* and *Douglas, Douglas & Douglas,* of Valparaiso, and *Fred F. Eichhorn, Jr.* and *Lawyer, Schroer & Eichhorn,* of Hammond, for appellee.

HUNTER, J.—This is an appeal from the Porter Superior Court where appellant filed suit against appellee for reimbursement pursuant to a contract of indemnity entered into between the parties herein. The trial court entered judgment against plaintiff-appellant and for defendant-appellee.

The occurrences pertinent to this action are as follows: appellant railroad company owns a set of railroad tracks over which appellee electric company desired to extend power lines; in obtaining a right to place the lines over appellant's tracks, the parties herein entered into a written licensing agreement which contained the following provision:

"Sixth: Second Party (Nipsco) shall and will at all times hereafter indemnify and save harmless First Party (NYC) from and against any and all detriment, damages, losses, claims, demands, suits, costs, or expenses which First Party (NYC) may suffer, sustain, or be subject to, directly or indirectly, caused either wholly or in part by reason of the location, construction, maintenance, use or presence of said Work as permitted by this license or resulting from the removal thereof, except such as may be caused by the sole negligence of First Party (NYC), its agents or employees."

After the power lines had been built over the tracks for some time, appellant undertook to replace the steel rails of the center set of tracks. To effectuate this replacement, appellant moved a gondola car loaded with steel rails to the section of the tracks just below the overhead wires. To unload the rails, appellant rented a twenty-five (25) ton truck crane with a forty (40) foot boom maintained by an operator and an oiler from another corporation engaged in the crane rental business. While the crane operator was unloading sections of track with the help and direction of appellant's employees, the end of the boom struck one of the appellee's high tension wires. The current from the wire went down the cable attached to the boom into the gondola car grounding through one of appellant's laborers causing fatal injuries to him.

Eventually a claim instituted by the widow of the laborer against appellant in the U.S. District Court was settled for Thirty Thousand ($30,000) Dollars which sum was paid by appellant. Afterwards, appellant filed suit against appellee in Porter Superior Court to recover the amount of the claim pursuant to the indemnity clause quoted above which resulted in the judgment against appellant. The trial judge entered special findings of fact which are in part as pertinent to this opinion, as follows:

After setting out the licensing agreement which contained the indemnity clause, the court found that:

". . . the plaintiff rented from one Daniel J. Varady a mobile crane together with a crane operator and a driver for an undisclosed purpose on an hourly rental basis, the same to be used by the railroad for its own purposes, commencing on the 2nd day of October, 1957 . . .

. . . Daniel J. Varady had no knowledge of the work that was to be performed by the crane or the crane crew, and that the crane crew had been instructed merely to report to the railroad and that they would be instructed as to what work was to be done, and that they were to work for the railroad . . .

. . . plaintiff railroad, acting by and through said Wooley, thereupon directed the placement of the mobile crane along-

side the gondola car, furnished to the crane operator special tongs and attached them to the pulley on the mobile crane, and undertook the direction and control of the crane and the unloading of the rails . . .

. . . one Ivory Johnson, a track laborer employed by the plaintiff railroad, was stationed in the gondola car by his foreman; that on the direction of said foreman, Johnson grasped the tongs which were attached to the pulley operating on the boom of the crane in the course of the operation involved in hooking a rail to be lifted by the crane out of the gondola car and placed alongside the adjoining railroad track. That he was then and there electrocuted as the result of the boom of the crane coming in contact with one of the three electric transmission wires of the defendant, as a result of which he died . . .

. . . the boom of said crane was forty feet long and was mounted on the bed of a truck; that said crane was operated by means of controls located in a cab and could be lowered and raised by the crane operator stationed in the cab; that the height of the sides of the gondola car was sufficient so that the crane operator could not see the rails located in the gondola car, and that he was operating the crane upon the directions of the railroad's employees; that at the time of the accident the crane operator could not see the end of the crane or the power line by reason of the glare from the sun, and was swinging the boom around on orders from plaintiff's foreman, and was relying on said plaintiff's foreman for the movement and position of the crane and its boom.

. . . the operator of the crane in the course of his operation thereof was acting as the agent and servant of the plaintiff railroad, and that the electrocution and death of Ivory Johnson was the result of the negligence alone or the sole negligence of the plaintiff, New York Central Railroad, acting by and through its agents and employees.

. . . on May 11, 1963, the center wire of said three wires of the defendant was 29.65 feet above the rails on which the gondola car was located; that there has been no change in said track or in the defendant's wires at said place between the 2nd day of October, 1957, and the present date; that there is no evidence as to which wire of said three wires was struck by the boom of the crane nor as to the height of the wires above the rails at the time the wires were originally constructed or as to whether or not there has been any change in the evaluation of the track from the date the electric lines were constructed down to the 2nd day of October, 1957 . . .

. . . there is no evidence as to the reasonableness or unreasonableness of the settlement effected by the plaintiff railroad with the administratrix of the estate of Ivory Johnson."

Upon these and other findings of fact, the court stated the following conclusions of law:

"1. The law is with the defendant.

2. That the operator of the crane involved in the accident resulting in the death of Ivory Johnson was at the time and in the course of the operation of said crane the agent and acting under the direction and control of the plaintiff, The New York Central Railroad Company.

3. That Ivory Johnson met his death as the result of the sole negligence of the plaintiff, The New York Central Railroad Company.

4. That the defendant is not obligated under the terms of the agreement sued upon to indemnify the plaintiff for the amount of its liability and payment to the administratrix of the estate of Ivory Johnson."

Within the findings of the lower court there is no direct finding that the servant was negligent. However, due to the lower court's finding that the servant was the agent or employee of the railroad, it was not necessary to decide if the acts of the servant were negligent. Even if the servant were negligent, the claim would still have arisen from the sole negligence of the appellant and its employees, which rendered the hold harmless clause inoperative. The question is did the lower court err in its finding that the operator was the servant of the appellant.

Both the appellant and the appellee seem to agree that the determining question placed before this court involves the borrowed servant doctrine which states that an employee, while generally employed by one party, may be loaned to another in such a manner that the special employer may be responsible for the acts of the employee under the doctrine of *respondeat superior*. Indiana has recognized this doctrine. *Standard Oil Company* v. *Soderling*

(1942), 112 Ind. App. 437, 446-448, 42 N. E. 2d 373; *Sargent Paint Co.* v. *Petrovitzky* (1919), 71 Ind. App. 353, 124 N. E. 881. If the operator were the borrowed servant of the appellant, then under the terms of the contract the "claim" was "caused by the sole negligence of" the appellant, "its agents or employees." Therefore, it would not be within the indemnification provision. In the converse if the operator remained the servant of the Vic Kirsh Trucking Company or Daniel Varday, Inc., and if the operator were negligent the claim arose not out of the sole negligence of the appellant. Consequently, the indemnification provision would be fulfilled and the indemnitee would be bound by such (assuming the operator to have been negligent).

In their argument and briefs both the appellee and the appellant overlooked that there was a third possibility: to-wit: that the operator could have been the employee of both employers. The Restatement of Agency, Second, acknowledges this concept in § 226 where it is stated:

"A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other."

Certainly there is nothing in the facts at bar that involves an abandonment of the service of either of the possible employers while operating the crane. The operator was furthering the business of both. Consequently, as to the particular act in question the operator might have been the employee of both the appellant and Kirsh Company or Varday, Inc. Normally the choice between the three alternatives is a question of fact for the jury or in this case the court. For cases applying this in-between view as to a borrowed servant question, see *Edwards* v. *Cutler-Hammer, Inc.* (1956), 272 Wis. 54, 74 N. W. 2d 606; *Dickerson* v. *American Sugar Refining Co.* (3rd C. C. A. 1954) 211 F. 2d 200; *Keitz* v. *National Paving and Contracting Co.* (1957), 214 Md. 479, 134 A. 2d 296; *Kimble* v. *Wilson* (1945), 352 Pa. 275, 42 A. 2d 526; *Siidekum* v.

*Animal Rescue League* (1946), 353 Pa. 408, 45 A. 2d 59. What effect this would have within the language of the indemnification provision is extremely uncertain. However in view of the decision we are reaching it is not necessary to decide this point.

As expressed in the above Indiana cases, this is usually a question of fact for the jury or court. However, the appellant contends that the judgment of the lower court and its findings are contrary to law. The appellant contends that there was no evidence to support the trial court's finding that the operator was its borrowed servant; therefore the decision was contrary to law.

The decision of the trial court will only be set aside as contrary to law if the evidence is without conflict and can lead to but one conclusion on which reasonable men cannot differ and which is opposite to that reached by the trial court. In deciding this question we do not weigh the evidence but view only that most favorable to the appellee. *Stidd* v. *Dietz* (1963), 135 Ind. App. 149, 152, 192 N. E. 2d 651.

To a limited extent the facts at bar present a case of first impression as we have found no cases in Indiana which are on "all fours" with the instant case. In fact, Indiana has had very few cases dealing with the borrowed servant question. Therefore we must turn to other jurisdictions where there is an abundance of case law relative to the question. For a collection of cases involving similar situations to the facts at bar, see Annotation 17 A. L. R. 2d 1388. This annotation states that cases on the borrowed servant question are not easily harmonized. It attributes much of the confusion to the principle that this question is normally one of fact for the jury or trial court on the rule that courts of appeal do not weigh evidence.

However, the Indiana cases have broadly defined the methods of analysis. In *Sargent Paint Co.* v. *Petrovitzky, supra,* p.

359, the court stated that in determining who the master is, it "becomes necessary to ascertain who was the master *at the very time of the negligent act.*" (our emphasis). The court also stated that in determining who is the master" . . . we must inquire whose work is being performed." This question is answered by ascertaining ". . . who has the power to direct and control the work being performed . . ." In addition, it is not who actually controlled the actions of the servant ". . . but who had the right to control." See also *Standard Oil Company* v. *Soderling, supra; Indiana, etc., Traction Co.* v. *Benadum* (1908), 42 Ind. App. 121, 83 N. E. 261.

These principles are deceivingly simple. The annotation noted above shows that while most of the jurisdictions purport to use the same methods of analysis, those being the "control" and "whose business" tests, with the recent development of "the scope of business" test, the results obtained by the various jurisdictions are conflicting as to one another and even within a single jurisdiction. In regard to this area of the law, it has been stated by the eminent jurist, Justice Cardozo, in "A Ministry of Justice," 35 Harv. L. Rev. 113, 121 (1928) :

> "The law that defines or seeks to define the distinction between general and special employers is beset with distinctions so delicate that chaos is the consequence. No lawyer can say with assurance in any given situation when one employment ends and the other begins. The wrong choice of defendants is often made, with instances, all too many, in which justice has miscarried."

Although this statement was made a quarter of a century ago, few aspects of this area of case law have changed except that the state of the law might be correspondingly more confusing.

We would agree with the appellant that there are cases whose holdings are seemingly in conflict with the decision reached in the lower court, in that under similar fact situations other jurisdictions have held that the operator remained

the servant of the lessor or general employer. See *The Standard Oil Co.* v. *Anderson* (1909), 212 U. S. 215, jury verdict against general employer affirmed; *White* v. *Bye* (1955), 342 Mich. 654, 70 N. W. 2d 780, affirmed jury verdict against general employer; *Agostini* v. *W. J. Halloran Co.* (1955), 82 R. I. 466, 111 A. 2d 537, affirmed jury verdict against general employer; *Mature* v. *Angelo* (1953), 373 Pa. 593, 97 A. 2d 59, affirmed a jury verdict against general employer; *Ambrosius Industries* v. *Adams* (1956), Ky., 293 S. W. 2d 230, affirmed a jury verdict against general employer.

However, there are many cases based on facts similar to the case at bar which are in accord with the lower court's finding that the operator was the borrowed servant of the appellant (lessee). For examples, see: *Knutson* v. *Lambert* (1951), 235 Minn. 328, 51 N. W. 2d 580. The court held that the question was not properly left to the jury. There should have been a directed verdict for lessor. *Nepstad* v. *Lambert* (1951), 235 Minn. 1, 50 N. W. 2d 614, a jury verdict against general employer reversed under similar facts to case at bar. *Hartford Fire Ins. Co.* v. *Henry J. Spieker Co.* (1956), 103 Ohio App. 455, 146 N. E. 2d 138. This was an action by insurers of lessor as subrogee against lessee as defendant. The directed verdict against lessee was held improper. This was a question for the jury. The case involved facts which could be differentiated from the case at bar. *Scharf* v. *Gardner Cartage Co.* (1953), 95 Ohio App. 153, 113 N. E. 2d 717. This case involved an instruction that stated that bailor was responsible for a negligent act of the loaned servant. The court held that the jury should have also been instructed on the loaned servant doctrine. It was for the jury to decide. *McAndrews* v. *E. W. Bliss Co.,* (6th C. C. A. 1951), 186 F. 2d 499. A peremptory instruction for lessor was properly granted. See also *Wylie* v. *Stewart Machinery Co.* v. *Thomas* (1943), 192 Okl. 505, 137 P. 2d 556; *McFarland* v. *Dixie Machinery & Equipment Co.* (1941), 348 Mo. 341, 153 S. W. 2d 67.

We might attempt to discuss all these cases in an effort to differentiate and harmonize them. However, this would merely add to the confusion. For the most part these decisions are irreconcilable and we do not feel that we could be any more successful than those jurists who preceded us. Another author has stated in this regard:

"... one seeking an explanation of the results of the borrowed servant cases in terms of weighing the elements of control is inexorably driven to the expedient of making and accepting 'disparate refinements,' ethereal in substance and revolting in reason, in order to approach any semblance of reconciliation." Smith, "Scope of Business: The Borrowed Servant Problem," 38 Mich. L. Rev. 1222, 1253 (1940).

In the majority of the above cases the lower court was affirmed. The questions of fact were properly decided by the court or the jury. Most of the language represented attempts to affirm rather than specifically develop rules of law. Throughout either of the lines of cases, there can be found three leading theories used to analyze the borrowed servant situation. First, is the "whose business" test. This test attempts to discern whether the operator was furthering the business of the special or general employer. It would seem to be an accurate statement to say that in the borderline cases, the liability will be placed on that employer's business which the court or the jury under the facts chooses to emphasize. For a recent case which applies this test without the corollary use of the "control test," see *White* v. *Bye, supra.* The result in the trial court could easily have been different by the court or jury interpreting the conflicting evidence from the view of business of the special employer. In said case the lower court was affirmed and not reversed, the Michigan Supreme Court in effect stated that the facts were sufficient to justify the verdict.

Second is the "control test" which is normally used in conjunction with the "whose business" test. This test attempts to analyze the borrowed servant question by finding

which employer had the right to control the specific act in question. As will be shown subsequently, the results can vary with the facts chosen to be emphasized. Compare *Scharf* v. *Gardner Cartage Co., supra; Mature* v. *Angelo, supra;* and *Nepstad* v. *Lambert, supra.*

The third test, "the scope of business" was developed to cure the ambiguities and confusion that resulted from the application of the "whose business" and "control" tests. It seemed to originate in the article by Professor Smith, "Scope of Business: The Borrowed Servant Problem," *supra.* This test attempts to incorporate the scope of employment terminology and application as used in the normal respondeat superior situation; that is if the work being done by the servant is within the scope of business of the special employer, then the liability for such acts lies with the special employer. On reading the above article it would seem that in the borderline cases Professor Smith is advocating a test based upon policy consideration which would normally place liability on the special employer. For cases applying this test see *White* v. *Bye, supra,* (J. Smith who concurred in the result only is the same person as Professor Smith) ; *Wylie Stewart Machinery Co.* v. *Thomas, supra; McFarland* v. *Dixie Machinery & Equipment Co., supra;* and *Nepstad* v. *Lambert, supra.* In addition, the Restatement of Torts, Second, § 227 seems to implicitly adopt this test as well as using the "control" and "whose business" tests. See particularly comment (h) § 220 and comment (a) of § 227. It should be noted that all of the above authorities use the "scope of business" test in conjunction with the "control" and "whose business" tests. It seems to be used as a final testing factor in the borderline cases. However, we are not of the opinion that it provides a more exacting and consistent result. As shown by those cases which have partially adopted the test, it can be applied with a different emphasis on either the special or general employer and the liability could rest with either employer within the same

given state of facts. Compare *White* v. *Bye, supra,* and *Nepstad* v. *Lambert, supra.*

As previously shown, Indiana has adopted the "control" and "whose business" tests in attempting to discern which employer had the right to control the specific act in question.

We would not necessarily adopt the scope of business test nor would we reject it. In the discussion above we feel that it has been demonstrated that this test can result in much the same confusion as the control test due to the fact that in the borderline cases as in the facts at bar, an operator leased with the crane is many times operating within the scope of business of both employers. As the lower court made no findings as to this test, we find that it would be improper to consider this test as controlling in this appeal. However, as will be demonstrated subsequently, the results would not differ even if it were deemed to be controlling.

In the facts at bar the general employer had the right to hire and fire the servant. It paid the servant's wages and was in charge of the care and maintenance of the machine. Additionally the general employer was in the business of renting similar machines and the operator was a semi-skilled employee. In some respects these uncontroverted facts would indicate that the general employer had a right to control the specific act in question.

However, other facts indicate the contrary. The appellant in leasing the machine did not indicate what work was to be done. The testimony in the record indicates that the general employer was merely told to send a crane with an operator and oiler to report to the railroad who would have someone to direct them. When the operator and oiler arrived at the job, the foreman asked them if they were the crew that was to work for him. He explained the method of operation required as to where to lay the rails upon being unloaded from the gondola car. The yard foreman hooked

a type of tongs onto the cable of the crane. He had previously directed the placement of the gondola below the high tension wires. The crane was working in close contact with the other employees of the railroad. The crane operator could not see into the gondola car where the men were working and attaching the tongs to the rails. In regard to the directions being given by the foreman in the way of hand signals to the operator, the evidence is in conflict. However, it is certain that the operator was looking for some signals from the foreman at the moment the boom hit the overhead wires. There had been some directions given by the foreman previously. In addition the general employer had no idea of the nature of the work. The lease was to continue for an indeterminate period at the option of the appellant. Also the nature of the work was well within the scope of business of the railroad, that of unloading a car of rails, and there is testimony in the record to the effect that the foreman was an experienced crane operator. From all of these facts the court could have concluded that the special employer (appellant) had the right to control the operator in the operation of the crane as to the act in question, and that the work being done was within the scope of the appellant's business.

The appellant places particular emphasis on the fact that the general employer had responsibility for the care and maintenance of the machine. However, as previously expressed, it is the right to control relative to the specific act in question. Consequently, in a situation as in the facts at bar, it is necessarily true that the general employer could be liable for the results of certain acts of the operator while the special employer could be liable for the results of other acts of the operator. The Restatement of Torts, *supra,* adopts this position in § 227 which states:

"A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others."

In *Scharf* v. *Gardner Cartage Co., supra,* the act in question could have been due to the negligence of the bailor in supplying a defective machine or due to the negligence of the borrowed servant as the agent of the bailee in the operation of the machine. The court stated that whether servant was the agent of the bailor or bailee and the question of whose negligence resulted in the accident were both questions for the jury. See also *Nepstad* v. *Lambert, supra,* wherein the court stated at p. 621:

"... there is nothing logically inconsistent, when using this test in findings that a given worker is the servant of one employer for certain acts and the servant of another for other acts."

See n. 12, p. 621 for cases which hold a machine operator performing work for another to be the servant of the special employer while operating the machine, whereas in the care and maintenance, the servant is in the employment of the general employer as to the act in question. Therefore, in the facts at bar, merely because the general employer was responsible for the care and maintenance, does not mean that the appellant did not have the right to control as to other aspects of the operation. Furthermore, the evidence shows that the accident did not result from negligence in the care and maintenance of the crane.

As shown from the above facts certain emphasis can lead to different results by emphasizing the elements of hiring, firing, payment, nature of the equipment, job specialization, the right to control seems to be in the general employer as well as the work being within its scope of business. In viewing the oral statements surrounding the actual leasing, direction on the job, nature of the work in relation to the appellant's normal business, the special employer seemed to have the right to control and the work was within its scope of business.

In this regard some cases have taken the language expressed in *Standard Oil* v. *Anderson, supra,* at p. 221 and make such actions only indicators of cooperation and requests rather than indicative of the right to exercise control. While these distinctions might be valid in some cases, we fail to see that the facts outlined above indicate requests rather than control.

Certainly we have present a case where reasonable men might differ as to which employer had the right to control the operator in the movements and operation of the crane and as to whether the operator was within the scope of business of the special employer. We as a matter of law might say that some elements should be determinative in deciding which employer had the right to control, thereby changing the result from that found by the lower court. However, we believe that all of the facts outlined above were properly considered and the findings and conclusions of law are supported by sufficient evidence.

We might add that we would prefer another view in face of the facts at bar as that both employers had the right to control the operator in line with § 227 of the Restatement of Torts, *supra.* In reviewing this question we have found that many of the borderline cases are attempting to find a single legal relationship within the doctrine of *respondeat superior* which in reality does not exist, i.e., between the two employers it is not necessary and rarely does it exist in these borderline cases that only one employer had the right to control as to the very act in question. However, we are dealing with a question of fact in which we as an appeals court cannot weigh the evidence.

Finally, appellant asserts that the appellee failed to maintain the power lines at the height of thirty-one (31) feet as prescribed in the licensing agreement, and that such failure was a cause of the accident in question.

Inherent in the railroad's said final contention of the indemnification liability of the power company is the proposition that the mere presence of the three power lines crossing the railroad right of way, the center one of which was approximately sixteen (16) inches too low under the license agreement without proof of more was *a cause* of the electrocution; and hence the tragedy was not caused by the "sole act" of the railroad. The indemnity clause does not provide that the appellee power company will indemnify appellant for *any act* or *cause* of injury not caused by the *sole act* of the railroad but rather *only* those injuries, claims, etc. "except such as may be caused by the sole negligence of the railroad, its agents or employees."

The indemnification provision must receive a fair construction by this court. *The Indianapolis, Pittsburg, and Cleveland Railroad Co.* v. *Brownenburg* (1869), 32 Ind. 199. The exception phrased as "not caused by the *sole negligence* of the railroad," can only be construed to mean that if some other legally recognized causation exists then the railroad should be indemnified. This cannot be construed to mean any other physical causation. It refers to sole negligence: therefore the exception to this exception would be where some other act of negligence contributed to the injuries, claims, etc., i.e., a concurring negligent act or a contributory negligent act by some party other than the railroad.

The trial court did not find that the failure to maintain the height of the wires as prescribed by the agreement constituted a negligent act. The trial court found that there was only evidence that the height of the *center* wire was sixteen inches below the prescribed height; and there was no evidence as to which wire the boom struck. Also, the trial court found there was no evidence "as to whether or not there has been any change in the evaluation [elevation] of the track"[1] since the original constructions.

---

1. Court's special finding of fact No. 13, *supra.*

As there is no evidence in the record that the accident was caused other than by the sole negligence of the appellant, its agents or employees, we hold that the trial court correctly found that the electrocution and resulting liability was within the exception of the indemnity clause as "caused by the sole negligence of the railroad, its agents or employees."

We therefore hold that there is sufficient evidence of probative value and reasonable inferences to be drawn therefrom to support the lower court's special findings of fact and conclusions of law.

There being no error committed by the trial court, we find that the judgment should be affirmed.

Judgment affirmed.

Smith, C. J., Bierly and Mote, JJ., concur.

NOTE.—Reported in 221 N. E. 2d 442.