Dorothy I. LAUX, Plaintiff,

v.

Jon A. JUILLERAT, etc., et al., Defendants.

No. C–3–85–732.

United States District Court,
S.D. Ohio, W.D.

Aug. 10, 1987.

Stanley S. Phillips, Valerie Stocklin, Dayton, Ohio, Gary Flinn, Greenville, Ohio, for plaintiff.

Lon R. Racster, George O. Lopez, Portland, Ind., David M. Rickert, Charles J. Faruki, Dayton, Ohio, for defendants Jon A. Juillerat and Jon A. Juillerat & Co.

J. Kenneth Meagher, Cincinnati, Ohio, for defendant Transamerican Freight Lines.

OPINION; FINDINGS OF FACT AND CONCLUSIONS OF LAW; ENTRY OF JUDGMENT OF JULY 10, 1987 (DOC. #61) AMENDED, TO WIT: JUDGMENT ORDERED ENTERED JOINTLY AND SEVERALLY AGAINST DEFENDANTS JON A. JUILLERAT AND TRANSAMERICAN FREIGHT LINES, INC. AND IN FAVOR OF PLAINTIFF IN THE AMOUNT OF $550,000 PLUS INTEREST; JUDGMENT ORDERED ENTERED ON DEFENDANT TRANSAMERICAN FREIGHT LINES, INC.'S CROSS CLAIM IN FAVOR OF DEFENDANT TRANSAMERICAN AND AGAINST DEFENDANT JUILLERAT; JUDGMENT ORDERED ENTERED IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT JUILLERAT FOR INTEREST FROM 6/29/87 THROUGH 7/7/87 PURSUANT TO AGREEMENT OF COUNSEL; TERMINATION ENTRY

RICE, District Judge.

This case arises out of the death of Luvern J. Laux in an accident involving a

tractor-trailer driven by one Myron Warfel. Prior to trial of this matter, the Court bifurcated consideration of the issues presented into phase one, which would consider the issues of Mr. Warfel's negligence, proximate causation and the amount of damages necessary to compensate for Mr. Laux's death, and phase two, which would consider, firstly, whether Mr. Warfel was the servant of Defendant Juillerat or Defendant Transamerican at the time of the accident and, secondly, the validity of an indemnification clause in the trip lease agreement by which Defendant Transamerican obtained the use of Defendant Juillerat's tractor-trailer. The projected first phase of trial in this case was resolved by stipulations, set forth below, entered into by all parties. Phase two was heard by the Court, sitting as trier of fact, on July 7, 1987.

## I. STIPULATIONS

Each of the parties to this action has entered into the following stipulations of fact:

1. On September 30, 1983, Jon A. Juillerat was the employer of Myron E. Warfel, and the owner of a tractor-trailer, operated by Warfel, on that date, under a trip lease and interchange agreement between Juillerat and Transamerican Freight Lines, Inc.

2. On said date, Myron E. Warfel's tractor-trailer was involved in a collision with an automobile operated by Plaintiff's decedent, Luvern J. Laux. Mr. Warfel was negligent in the operation of said tractor-trailer and this negligence was the sole proximate cause of the accident and death of Luvern J. Laux.

3. Plaintiff and decedent Luvern J. Laux's beneficiaries were damaged in the amount of $550,000 by the wrongful death of Mr. Laux.

## II. FINDINGS OF FACT

Based upon the evidence presented to it at trial on July 7, 1987, the Court makes the following, non-exclusive Findings of Fact:

1. Plaintiff Dorothy I. Laux is the executrix of the estate of Luvern J. Laux, and a resident of New Madison, Ohio.

2. Defendant Jon A. Juillerat, doing business as Jon A. Juillerat & Co., is a resident of Indiana.

3. Defendant Myron E. Warfel is a resident of Indiana.

4. Defendant Transamerican Freight Lines, Inc., is a corporation incorporated in the state of Delaware with its principal place of business in the state of Michigan.

5. Warfel was hired by Juillerat and could be discharged or disciplined by Juillerat.

6. On September 29, 1983, Warfel entered into a trip lease and interchange agreement on behalf of Juillerat with Transamerican. This trip lease agreement was in effect on September 30, 1983, at the time of the accident in which Luvern J. Laux was killed.

7. Warfel was authorized by Juillerat to enter into trip lease agreements on his (its) behalf, and had done so prior to September 29, 1983, with Transamerican. *See* Plaintiff's Exhibits 1.1, 1.2 and 1.3.

8. The back side of the trip lease agreement signed by Warfel contained 12 numbered paragraphs entitled "Terms and Conditions of Lease Interchange Agreement." Numbered paragraph 1 of these terms and conditions states:

OWNER–LESSOR agrees that he will bear the entire cost of operating said vehicle equipment, provide all fuel, fuel taxes, license tags, special permits, tolls or ferry charges, drivers license and pay all union fees or dues, and all fines, and any and all other fees and empty miles that may in any way be required to be paid in connection with the operation of said motor vehicle equipment, operate said motor vehicle equipment himself, or he will cause said motor vehicle equipment to be operated only by a competent employee of the Owner–Lessor. Nothing herein is to be construed as constituting Owner–Lessor as the employee or representative of the Carrier–Lessee. When failure or breakdown of Owner–Lessor's

vehicle causes Carrier–Lessee to incur expense through dispatching a relief vehicle to point of breakdown and/or transport a trailer and/or load to destination such expense shall be the responsibility of the Owner–Lessor and any monies advanced by Carrier–Lessee for this purpose shall be deducted from the lease pay-off by Carrier–Lessee.

Joint Exhibit I.

9. Numbered paragraph 2 of these terms and conditions provides:

OWNER–LESSOR further agrees to indemnify, and save the Carrier–Lessee harmless from all and any loss, damage or expense arising out of fire, theft, collision, accident or other casualty or event effecting such equipment. The Owner–Lessor agrees to indemnify and to hold the Carrier–Lessee harmless from all loss and damage to property belonging to or leased by the Carrier–Lessee and from all losses and claims for damage to cargo that shall be occasioned or caused by the negligence or fault of the Owner–Lessor or the driver or operator of said equipment designated by the Owner–Lessor.

Joint Exhibit I.

10. Numbered paragraph 3 of these terms and conditions provides:

OWNER–LESSOR hereby agrees to indemnify and save harmless Carrier–Lessee from any and all claims, suits, losses, fines or other expenses arising out of [,] based upon or incurred because of any injury to person or persons, or damage to property sustained or which may be alleged to have been sustained by reason of any negligence or alleged negligence on the part of Owner–Lessor, its agents, servants, and employees, and for any loss or damage to cargo resulting from any negligence or unlawful act of Owner–Lessor, his agents, servants, and employees. Owner–Lessor agrees to pay an administrative fee of $25.00 in addition to any claim or loss in order to reimburse Carrier–Lessee for its costs in processing such claims.

OWNER–LESSOR will defend at his own expense and costs any and all suits that may be brought against Carrier–Lessee for injuries sustained, including death resulting therefrom or damage to property caused or alleged to have been caused by the negligence of any person employed by Owner–Lessor while engaged in their performance of any work required by the terms and conditions of this agreement, and for any cargo loss sustained resulting from any negligence or unlawful act on the part of Owner–Lessor, his agents, servants and employees. Nothing in this paragraph shall be construed to in anywise limit the liability of the Carrier–Lessee to the public in connection with the use of said equipment under this agreement.

Joint Exhibit I.

11. Numbered paragraph 5 of these terms and conditions provides:

OWNER–LESSOR agrees to call Carrier's Central Dispatch Department when loaded and as instructed thereafter including notification of final delivery to obtain a release number. Owner–Lessor agrees that in the event of any continuous delay, whether by breakdown or otherwise, in excess of (24) hours or sooner, if indicated in driver instructions, he will promptly notify Carrier–Lessee by telephone collect, of the location of such motor vehicle equipment, the nature of delay and the estimated period of such delay. Failure to make any of the aforementioned calls will result in forfeiture of $50.00 of load revenue.

Joint Exhibit I.

12. Numbered paragraph 11 of these terms and conditions provides:

Compensation under this lease is based on door-to-door delivery (pick up at the customer's place of business and delivery to the customer's place of business). Any expense incurred as a result of the Lessor or his driver failing to complete door-to-door pick up or delivery shall be the responsibility of the Lessor and shall be deducted from the lease pay off by the Lessee. In the event loading or unloading is performed by persons other than the Lessor, then the Lessor shall reimburse the Lessee for any costs or

expenses incurred by Lessee as a result thereof. The Lessor will be responsible for any spotting and switching charges as they relate to the pick up or delivery of freight by the trailer he is pulling. Such charges will be deducted from the lease pay off by the Lessee.

Joint Exhibit I.

13. Numbered paragraph 11 of these terms and conditions provides:

OWNER–LESSOR agrees to report any accident occurring while this lease is in effect or any inspection by police, ICC, DOT or State inspectors. Such report shall be made to Carrier–Lessee's Central Dispatch Department and should be noted on the face of this lease. Further, any inspection report or citation issued as a result of such inspection must be turned in to the Carrier–Lessee's destination terminal at the termination of the lease. Failure to make the required report or turn in the inspection report or citation will result in forfeiture of $50.00 of the load revenue.

Joint Exhibit I.

14. Numbered paragraph 12 of these terms and conditions provides:

Lessor will cooperate with Lessee in the preparation, carrying and preservation of manifests, bills of lading, weigh bills, freight bills, and other papers and records respecting the lading and use of the equipment in accordance with all applicable laws and regulations and corporate policies. It is agreed that performance under this lease has not been completed until all documents are delivered and accepted by Carrier–Lessee or its agent.

Joint Exhibit I.

15. Payment under the trip lease was made by Transamerican to Juillerat. Juillerat then paid Warfel for the return trip on the trip lease. Had Warfel not obtained a trip lease on the return trip from Michigan, he would not have been paid for the return trip.

16. In addition to the trip leases entered into with Transamerican through Warfel (Plaintiff's Exhibits 1.1–1.3 and 2.1–2.2), Juillerat entered into numerous other trip leases with Transamerican containing "terms and conditions of lease interchange agreement" on their back sides, including indemnification clauses, identical to those on the trip lease agreement of September 29, 1983 (Joint Exhibit I). *See* Plaintiff's Exhibits 3.3–3.34 and 4.1–4.12. Juillerat also entered into trip lease agreements with other carriers containing indemnity provisions similar to those of the September 29, 1983 agreement with Transamerican. *See* Plaintiff's Exhibits 5, 6, 7 and 8. Mr. Juillerat and his employees never read the terms and conditions printed on the back side of these trip leases.

## III. DISCUSSION

This is a wrongful death action in which the Plaintiffs allege that a truck driver, Myron E. Warfel, who was employed by Defendant Juillerat and driving under a trip lease agreement for Defendant Transamerican, negligently caused the death of Luvern J. Laux. Defendant Myron Warfel has not been served in this action, but the remaining parties have stipulated that his negligence was the proximate cause of Mr. Laux's death. Defendant Transamerican, moreover, has conceded that it is legally liable, pursuant to the regulations of the Interstate Commerce Commission (specifically, 49 C.F.R. § 1057.22), for the wrongful acts of Warfel which caused the death of Mr. Laux. The parties have also stipulated that Mr. Laux's survivors are entitled to damages in the amount of $550,000. Thus, the only issue remaining on Plaintiff's Complaint is whether Defendant Juillerat is also liable (jointly and severally) with Transamerican for the death of Mr. Laux under a state law theory of respondeat superior.

Also before the Court as trier of fact is Defendant Transamerican's Cross Claim against Defendant Juillerat arising out of an indemnification term in the trip lease agreement entered into by Warfel on Juillerat's behalf with Transamerican. Juillerat argues that this indemnification clause is not enforceable against him because Warfel was without authority to enter into it, because by its terms it is not applicable to

the facts presented in this case, because it is void as unconscionable or as an adhesion contract, and because the clause is contrary to public policy.

## A. *Choice of Law*

■ Prior to determining whether Defendant Juillerat was responsible for the actions of Warfel at the time of the accident, under a state law respondeat superior theory and whether the indemnification clause in the trip lease agreement is enforceable against Juillerat, the Court must determine which state's law is applicable with respect to each of these issues. A federal district court sitting in diversity, as the Court does herein, must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Ohio has explicitly adopted the Restatement of the Law of Conflicts, Second, for determination of the law applicable in contract and tort actions. *See Nationwide Mutual Insurance Co. v. Ferrin*, 21 Ohio St.3d 43, 487 N.E.2d 568 (1986) (contracts); *Morgan v. Biro Manufacturing Co.*, 15 Ohio St.3d 339, 474 N.E.2d 287 (1984) (torts). The Court, therefore, must apply the Restatement of the Law of Conflicts, Second, in determining the law applicable to the claims in this case.

Turning first to the determination of the law applicable to whether Juillerat is liable under a state law doctrine of respondeat superior, the Court notes that § 174 of the Restatement, Second, sets forth factors for determining which state has the most significant relationship to the persons and events relevant to the issue of respondeat superior liability:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

■ Applying these considerations to the present case, the Court must conclude that Indiana has the most significant relationship with the persons and events relevant

to the issue of liability under respondeat superior. In the present case, while the conduct causing the injury and the injury (Mr. Laux's death) occurred in Ohio, both Warfel and Juillerat are residents of Indiana and the relationship between them is centered exclusively in that state. Thus, while Ohio would have a significant interest in determining the law applicable to a determination of Warfel's liability in this case, its interests in governing the relationship between Warfel and his employer is minimal. Indiana on the other hand, has a strong interest in governing the relationship between employers and employees (masters and servants) when those relationship originate and exist exclusively within Indiana. Accordingly, the Court will apply the law of Indiana in determining whether Defendant Juillerat is liable under a theory of respondeat superior for the negligence of Warfel.

■ In determining what law should govern the enforceability of the indemnification clause of the trip lease agreement, the Court is actually faced with two issues: what law should govern the determination of whether Warfel was acting as Juillerat's agent in signing a trip lease agreement containing an indemnification clause and what law should determine whether the indemnification clause of that agreement (if properly entered into on Juillerat's behalf by Warfel) is applicable and enforceable against Juillerat within the facts of this case. In determining the law applicable to the issue of whether Warfel had the authority or power to bind Juillerat to the indemnification clause in the trip lease agreement, § 292(2) of the Restatement, Second, provides:

> The principal will be held bound by the agent's action if he would be bound under the local law of the state where the agent dealt with the third person, provided at least that the principal had authorized the agent to act on his behalf in that state or had led the third person reasonably to believe that the agent had such authority.

In the present case, it is uncontroverted that Warfel had the authority to enter into

trip lease agreements in Michigan (and he had done so previously without complaint from Juillerat), and so the law of Michigan (the state in which Warfel entered into the trip lease agreement containing an indemnification clause with Transamerican) will govern the issue of whether Warfel could properly act on Juillerat's behalf in entering into the indemnification agreement.

■ In determining which state's law should govern the meaning, validity and enforceability of a contract (including one for indemnification), § 188(2) of the Restatement, Second, sets forth the relevant factors for determining which state has the most significant relationship with respect to the events and parties so as to require that its law governed:

(a) the place of the contracting,

(b) the place of the negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

Application of these considerations to the facts in this case requires that Michigan law likewise be applied to the issue(s) of the construction of the indemnity clause, its validity and enforceability. The trip lease agreement containing the indemnification clause was negotiated (to the extent it was negotiated) and entered into in Michigan. The contract was performed and its subject matter located at various times in Michigan, Indiana and Ohio, although the contract by its terms only required performance in Michigan and Ohio. Juillerat, as noted above, is a resident of Indiana and has his principal place of business there; Transamerican is incorporated in Delaware, but has its principal place of business in Michigan. Weighing the factors set forth in the Restatement, Second, as a whole, the Court must therefore find that Michigan has the most significant relationship with the events and persons surrounding the indemnification clause of the trip lease agreement, and its laws must be applied by this Court in determining the construction, validity and enforceability of that clause.

In sum, the Court must apply Indiana law to determine whether Juillerat is liable on a respondeat superior basis for the negligence of Warfel that resulted in the death of Mr. Laux and Michigan law to determine each of the issues surrounding the enforceability of the indemnification clause of the trip lease agreement against Juillerat.

**B. *Liability of Juillerat to Plaintiff: Respondeat Superior and the Loaned Servant Doctrine***

■ Turning to the remaining issue presented by Plaintiff's Complaint against the Defendants, the liability of Juillerat for Warfel's negligence under the law of respondeat superior, the Court initially notes that Defendant Transamerican has admitted that it is liable for the negligence of Warfel which proximately caused Mr. Laux's death under ICC regulations governing trip leases between authorized carriers, and specifically 49 C.F.R. § 1057.22. The fact that ICC regulations impose liability on the lessee under a trip lease agreement, however, does not prevent joint and several liability for the same negligence from being imposed upon the owner-lessor of the truck under the applicable state law of respondeat superior. As the Fifth Circuit stated in *Simmons v. King*, 478 F.2d 857, 867 (5th Cir.1973), a case arising out of a collision between two tractor-trailer rigs in Louisiana:

Although [the lessee] is liable for [the driver's] acts as a matter of law, [the owner-lessor] could still be likewise liable under applicable common (civil) Louisiana standards of control. This is not as incongruous as might be supposed. ICC can mandate a positive legal responsibility which we uphold in the only way it would be meaningful—to give full protection to the injured member of the public. At the same time [the owner-lessor] has, or may have, a practical control over [the driver] of a kind which would not allow it to obtain an automatic insulation from liability from the mere terms of the lease between the two parties.

In other words, while the ICC regulations preempt state law to the extent that a state cannot absolve a lessee of liability for an accident occurring during the course of a trip lease, those regulations do not preempt state law from imposing additional (joint and several) liability upon an owner-lessor under the state's law of respondeat superior. Thus, in the present case, if the facts demonstrate that under the law of Indiana, Juillerat was the master of Warfel at the time of the accident such as to impose respondeat superior liability upon him, he would be jointly and severally liable with Transamerican for the damages Mr. Laux's death caused his survivors.

Generally, under the doctrine of respondeat superior, an employer is vicariously liable for the negligent or wrongful acts of his or her employees if those acts are done during the course of employment. Indiana, like most states, however, recognizes the loaned or borrowed servant doctrine, under which "an employee while generally employed by one party, may be loaned to another in such a manner that the special employer may be responsible for the acts of the employee under the doctrine of *respondeat superior.*" *Littleton v. Mardigan,* 458 F.2d 251, 254 (7th Cir.1972) (quoting *New York Central Railroad Co. v. Northern Indiana Public Service Co.,* 140 Ind.App. 79, 84, 221 N.E.2d 442, 446 (1966)). In other words:

> One may be in the general service of another and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation. The true test in determining who the master is, in the case of this character, is not who actually did control the actions and movements of the servant doing the work, but who had the right to control.

*Id.* (quoting *Sargent Paint Co. v. Petrovitzky,* 71 Ind.App. 353, 359, 124 N.E. 881, 883 (1919)).

The Indiana courts have also recognized that an individual may be the employee for

respondeat superior purposes of two employers at once:

> A person may be the servant of two masters, not joint employers, at one time as to one act, if this service to one does not involve abandonment of the service to the other.

*New York Central Railroad Co. v. Northern Indiana Public Service Co.,* 140 Ind. App. at 85, 221 N.E.2d at 446 (quoting Restatement of the Law of Agency, 2d, § 226). Thus, in determining whether Juillerat is vicariously liable under Indiana law for the negligence of Warfel, the Court must decide whether Warfel was the servant of Juillerat, Transamerican or both at the time of Mr. Laux's death. More specifically, the Court must determine whether, at the time of the collision that caused Mr. Laux's death, Juillerat, Transamerican or both of them had the right to control Warfel.

In determining whether a right to control a tortfeasor exists for a particular individual or company in the context of leases of expensive equipment which include use of the equipment operator, Ohio has adopted a more straightforward approach than Indiana. Under Ohio law:

> [A] continuation of the general employment is indicated by the fact that the general employer can properly substitute another servant at any time, that the time of the new employment is short, and that the lent servant has the skill of a specialist.

> A continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant operates it, particularly if the instrumentality is of considerable value. Normally the general employer expects the employee to protect his [the general employer's] interests in the use of the instrumentality, and these may be opposed to the interest of the temporary employer. If the servant is expected only to give results called for by the temporary employer and to use the instrumentality as the servant would expect his general employer would desire, the original service continues. Upon this question, the fact that the

general employer is in the business of renting machines and men is relevant, since in such case there is more likely to be an intent to retain control over the instrumentality.

*Ragone v. Vitali & Beltrami, Jr., Inc.*, 42 Ohio St.2d 161, 172–73, 327 N.E.2d 645, 652–53 (1975) (quoting Restatement of the Law of Agency, 2d, § 227, comment C). Indiana courts, however, while not rejecting these factors as appropriately considered in the determination of who has the right to control an employee, have included other factors in their determination of the right of control issue, such as each employer's relative expertise in the work being done, the degree of supervision and direction exercised by each employer or its agents over the employee and the length of the lease agreement. *See New York Central Railroad Company v. Northern Indiana Public Service Co.*, 140 Ind.App. at 91–92, 221 N.E.2d at 449–50. Moreover, under Indiana law, the terms of a contract between employers (i.e., the extent to which the language of the contract grants or deprives an employer of the power to do those acts which indicate a right of control) will be determinative on the issue of whose servant an employee is for respondeat superior purposes. *See Littleton v. Mardigan*, 458 F.2d at 255. (citing *Sargent Paint Co. v. Petrovitzky*, 71 Ind.App. at 366, 124 N.E. at 885).

■ Reviewing the facts of this case in light of these indicia of when a right to control exists, the Court must conclude that Warfel, at the time of the accident, remained within the right of control of Juillerat, and thus remained the exclusive servant or employee of Juillerat, or *at most* became a joint employee of Juillerat and Transamerican. In reaching this conclusion, the Court notes that Transamerican did assume at least a technical right of control over Warfel by the trip lease and under ICC regulations. In addition, under the trip lease agreement, Transamerican obtained the right to control the place of loading and unloading of the tractor-trailer, and the right to specify the freight to be carried. Moreover, Transamerican, under the contract, acquired a right to require

Warfel to report accidents and certain delays to it. Each of these rights is undoubtedly some indication of a right of control on Transamerican's part.

Juillerat, however, through the trip lease and its pre-existing employment relationship with Warfel, maintained a much broader right of control over Warfel at the time of the accident. Specifically, the Court finds that the trip lease agreement did not deprive Juillerat of his pre-existing power to fire or otherwise discipline Warfel at any time for his conduct in driving Juillerat's tractor-trailer. All payments for the trip lease haul were made to Juillerat by Transamerican, and he paid all costs of the trip including gas, tolls and wages due Warfel for the trip. Moreover, under the trip lease agreement, Juillerat was not required to use Warfel as a driver, but was entitled to drive the truck himself or could use any competent driver. Further, Transamerican had no right to control the route followed by Warfel in making his delivery or to direct Warfel's activities in any way other than as previously noted (i.e., identifying the load to be carried, the places of pick up and delivery, and reporting requirements for accidents and certain delays). Taking these factors as a whole, in the context of a lease for expensive equipment owned by Juillerat, the Court must conclude that Juillerat had a much broader right of control over Warfel at the time of the accident here in question than did Transamerican. The Court must therefore find that Warfel was the servant of Juillerat for respondeat superior purposes at the time of the collision which caused Mr. Laux's death, or that at that time Warfel was at least a joint servant of both Juillerat and Transamerican.

Accordingly, based upon the Court's finding that Warfel was for respondeat superior purposes either the employee of Juillerat at the time of the collision which caused Mr. Laux's death or at least a joint servant of Juillerat and Transamerican at that time, and based upon Transamerican's admission that it is liable for the negligence of Warfel under applicable ICC regulations, the Court must find that Defendants

Juillerat and Transamerican are jointly and severally liable to the Plaintiff for the damages caused to the survivors of Mr. Laux by his death.

C. *Transamerican's Cross Claim: Enforceability of the Indemnification Clause in the Trip Lease Agreement*

Having determined that Defendants Juillerat and Transamerican are jointly and severally liable to Plaintiff for the death of Mr. Laux, the Court now turns to the issue raised by Transamerican's Cross Claim— the enforceability of the indemnification clause of the trip lease agreement against Juillerat. As indicated above, Juillerat has raised four arguments in opposition to enforcement of the indemnification clause in the trip lease agreement:

1. Warfel acted beyond the scope of his authority in signing a trip lease agreement containing an indemnification clause;

2. The indemnification clause by its terms is inapplicable to Juillerat under the facts of this case;

3. The indemnification clause was unconscionable and/or constituted an adhesion contract; and

4. Indemnification clauses in trip lease agreements are contrary to public policy.

The Court will consider these arguments in the order presented.

1. *Warfel's authority to bind Juillerat to an indemnification clause*

Whether or not Warfel properly acted on Juillerat's behalf in signing a trip lease agreement containing an indemnification clause such as to bind Juillerat by the enforceable provisions thereof depends upon whether such power was within the actual, implied or apparent authority of Warfel as Juillerat's employee. No evidence has been presented that Warfel had actual (i.e. express) authority to enter into indemnification clauses as part of a trip lease agreement. Indeed, Juillerat, in his testimony, specifically denied granting Warfel such actual authority to enter into a trip lease agreement containing an indemnification clause. The Court finds, how-

ever, that the evidence presented does demonstrate that Warfel had both implied and apparent authority to enter into such indemnification arrangements.

■ Under Michigan law, which the Court has found to be applicable on the issue of Warfel's scope of authority:

Agents have the implied power to carry out all acts necessary in executing defendant's expressly conferred authority.... Whether the act in question is within the authority granted depends upon the act's usual or necessary connection to accomplishing the purpose of the agency.

*Smith, Hinchman and Grylls Associates, Inc. v. City of Riverside,* 55 Mich.App. 703, 223 N.W.2d 314, 316 (1974) (citations omitted). In the present case, the evidence showed that Warfel was expressly authorized to enter into trip lease agreements on Juillerat's behalf. Moreover, the evidence indicated that indemnity clauses are often a part of such trip lease agreements. *See* Plaintiff's Exhibits 1.1–1.3, 2.1–2.2, 3.1–3.-34, 4.1–4.12, 5, 6, 7 and 8. Thus, Warfel had the *implied authority* to enter into an indemnification arrangement as part of a trip lease agreement, and, absent an express command not to enter into such indemnification arrangements (a command Juillerat never gave Warfel), Juillerat was bound by such indemnification arrangements to the same extent that he would have been bound by such indemnification arrangements had he signed the trip lease agreement himself.

■ Moreover, the Court also finds that under the doctrine of *apparent authority* Juillerat was bound by the indemnification arrangement in the trip lease agreement to the same extent as if he had signed the agreement himself. Under Michigan law:

Whenever the principal, by statements or conduct, places the agent in a position where he appears with reasonable certainty to be acting for the principal, or without interference suffers the agent to assume such a position, and thereby justifies those dealing with the agent in believing that he is acting within his mandate, and apparent authority results

which replaces that actually conferred as the basis for determining rights and liabilities. The measure of authority consists of those powers which the principal has thus caused or permitted the agent to seem to possess, whether the agent had actual authority being immaterial if his power was within the apparent scope of his powers. . . .

*Michigan National Bank of Detroit v. Kellam*, 107 Mich.App. 669, 309 N.W.2d 700, 704 (1981) (quoting *Central Wholesale Co. v. Sefa*, 351 Mich. 17, 25, 87 N.W.2d 94, 98 (1957)). In the present case, Juillerat had previously permitted Warfel to sign several trip lease agreements containing indemnification clauses identical to that of the one signed on September 29, 1983, without notifying Transamerican that he (Juillerat) believed the indemnification clause exceeded Warfel's authority. *See* Plaintiff's Exhibits 1.1–1.3. Because such conduct placed Warfel in a position where he appeared, with reasonable certainty, to Transamerican to be acting on Juillerat's behalf in signing the trip lease agreement containing the indemnification arrangement, under the doctrine of apparent authority, Juillerat is bound by that indemnification clause to the same extent that he would have been had he signed the trip lease agreement himself.

In sum, under either a theory of implied authority or of apparent authority, Juillerat was bound by the indemnification clause of the trip lease agreement to the same extent he would have been had he signed the agreement himself.

### 2. *Applicability of indemnification clause terms to conduct of Warfel*

■ Having found that the indemnification clause of the trip lease agreement was binding upon Juillerat to the same extent that it would have been had he signed the agreement himself, the Court also finds that that clause by its terms requires Juillerat to indemnify Transamerican for any judgment collected against it arising out of Warfel's negligently causing the death of Mr. Laux. In reaching this conclusion, the Court notes that the indemnification clause in question (¶ 3 of the terms and conditions

found on the rear of the trip lease agreement) does not specifically mention drivers or operators in requiring indemnification for "any negligence or alleged negligence on the part of Owner–Lessor, its agents, servants and employees" in contrast to an earlier clause in the agreement (¶ 2 of the terms and conditions) which requires indemnification on the part of Juillerat for any damage to property of Transamerican or to the cargo "occasioned or caused by the negligence or fault of the Owner–Lessor or the driver or operator of said equipment designated by the Owner–Lessor." While Juillerat argues that the failure to include the terms "driver or operator" in the indemnification clause here sought to be enforced indicates that such drivers or operators were not intended to be included in that indemnification provision, the Court disagrees. Giving the language of the trip lease agreement its ordinary meaning, the Court must conclude that the provision providing for indemnification for the acts of agents, servants or employees was intended to have a broader coverage than the provision providing indemnification only for the acts of the driver or operator of the tractor-trailer. Warfel, as driver of the tractor-trailer, was an employee and/or agent and/or servant of Juillerat. Thus, the Court must conclude that the indemnification clause in question (¶ 3 of the terms and conditions of the trip lease) applies to the negligence of Warfel which proximately caused the death of Mr. Laux.

### 3. *Unconscionable and/or adhesion contracts*

■ Turning to Juillerat's argument that the indemnification clause is unenforceable because it is unconscionable and/or because it constitutes an adhesion contract, the Court disagrees and finds the clause enforceable under Michigan law. Under Michigan law:

[M]erely because the parties have different options or bargaining power, unequal or wholly out of proportion to each other, does not mean that the agreement of one of the parties to a term of a contract will not be enforced against him; if the term

is substantially reasonable, it will be enforced. By like token, if the provision is substantially unreasonable, it may not be enforced without regard to the relative bargaining power of the contracting parties. *Allen v. Michigan Bell Telephone Company,* 18 Mich.App. 632, 637–38, 171 N.W.2d 689, 692 (1969). Thus, under Michigan law, regardless of whether the parties are in unequal bargaining positions, a contractual term will be found unconscionable only if it is substantially unreasonable. The indemnification clause in the trip lease agreement between Juillerat and Transamerican, in this Court's view, cannot be found to be substantially unreasonable. While indemnification clauses in lease agreements which require the lessor to indemnify the lessee for negligence on the part of the lessee or his or her employees have been found to be substantially unreasonable under Michigan law, *see Palomba v. City of East Detroit,* 112 Mich.App. 209, 217, 315 N.W.2d 898, 902 (1982); *Brown v. Unit Products Corp.,* 105 Mich.App. 141, 148, 306 N.W.2d 425, 429 (1981), in the present case, the indemnification clause merely requires that the lessor indemnify the lessee for acts of negligence on the part of the lessor his employees. In other words, the indemnification agreement in this case merely protects Transamerican against negligent acts of employees chosen by Juillerat. The Court cannot find such a clause substantially unreasonable.

█ Moreover, the Court cannot find that the circumstances surrounding the signing of the trip lease agreement herein caused that agreement to become an adhesion contract. While the indemnification clause in question was contained on the back of the lease agreement, and as such was not as readily discernible as the terms on the front of the agreement, Juillerat and Transamerican were engaged in a long term business relationship which gave Juillerat ample opportunity to review the terms contained in Transamerican's standard trip lease agreement. While the testimony of Mr. Juillerat and his employees that they had never reviewed the terms and conditions on the back of the trip lease agreement, because they had never become a cause for concern prior to Warfel's accident, may be understandable in practical terms, such neglect does not thereby transform an ordinary business standard form contract into an adhesion contract. Mr. Juillerat had ample opportunity to learn of the terms and conditions of the lease agreement. It is axiomatic that a person who enters into a contract and who has an opportunity to read the terms of the contract cannot escape liability for his or her duties under the contract by failing to take that opportunity to read those terms. Accordingly, Mr. Juillerat is bound by the terms of this trip lease agreement.

4. *Indemnification clauses in trip lease agreements as contrary to public policy*

█ Turning finally to the issue of whether the indemnification clause in question is unenforceable as violative of the public policy favoring imposition of liability for damages caused by a tractor-trailer while operating under a trip lease agreement against the lessee under that lease, the Court finds the Supreme Court's decision in *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.,* 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975) controlling, and accordingly finds this indemnification clause enforceable. In *Brada Miller,* the Supreme Court held "that the presence in an equipment lease of an indemnification clause directed to the lessor's negligence is not in conflict with the safety concerns of the Commission or with the regulations it has promulgated." *Id.* at 41, 96 S.Ct. at 236. The indemnification clause in the Transamerican trip lease agreement does not attempt to limit Transamerican's liability to the public for any damages caused while a tractor-trailer is hauling under the lease; to the contrary, the agreement specifically accepts such liability. *See* Joint Exhibit I, ¶ 3 ("Nothing in this paragraph shall be construed to in anywise limit the liability of the Carrier–Lessee to the public in connection with the use of said equipment under this agreement."). Accordingly, the Court must con-

clude that the indemnification clause in this trip lease agreement is not contrary to public policy and is therefore enforceable against Juillerat.

In sum, the Court has rejected each of Juillerat's arguments against enforcement of the indemnification clause contained in the trip lease agreement executed on September 29, 1983, by Warfel, and accordingly finds that said indemnification clause is enforceable against Juillerat.

## IV. CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction over the captioned cause pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds $10,000.

2. The negligence of Myron Warfel on September 30, 1983, proximately caused the death of Luvern J. Laux, and resulted in damages to his survivor's in the amount of $550,000.

3. Pursuant to 49 C.F.R. § 1057.22, Defendant Transamerican under the trip lease agreement (Joint Agreement I) assumed legal control of the tractor-trailer in question and of Warfel. Defendant Transamerican is accordingly vicariously liable for the negligence of Warfel and the damages caused to the survivors of Mr. Laux thereby.

4. Defendant Juillerat held a right of control over Warfel at the time of the accident which resulted in the death of Mr. Laux. Warfel was, therefore, either the exclusive servant of Juillerat under state (Indiana) law or a joint servant of Juillerat and Transamerican under that law at the time of the accident. Accordingly, Juillerat is liable under state (Indiana) law for the negligence of Warfel and for the damages to the survivors of Mr. Laux proximately caused by that negligence.

5. Defendants Juillerat and Laux are, accordingly, jointly and severally liable for the damages proximately caused to the survivors of Mr. Laux by the negligence of Warfel, said damages being in the amount of $550,000.

6. Warfel held the implied authority to sign a trip lease agreement containing indemnification provisions on behalf of Juillerat, and accordingly, he bound Juillerat to the same extent he (Juillerat) would have been bound had he signed the trip lease agreement himself by the signing of the September 29, 1983, trip lease agreement with Transamerican.

7. Warfel had apparent authority, created by prior dealing between Juillerat and Transamerican, to enter into the trip lease agreement of September 29, 1983, containing indemnification provisions, and accordingly Juillerat is bound by that trip lease agreement to the same extent he (Juillerat) would have been had he signed that agreement himself.

8. By the terms of the trip lease agreement of September 30, 1983, Juillerat expressly agreed to indemnify Transamerican for all claims such as those asserted by the Plaintiff in this case, and to further pay any and all expenses, including attorneys fees, incurred in order to save harmless Transamerican from such claims.

9. The indemnification clause (¶ 3 of the terms and conditions) of the trip lease agreement in question does not constitute either an unconscionable nor an adhesion contract, and so is not unenforceable under state (Michigan) law.

10. The indemnification clause likewise is not contrary to the public policy of holding lessees in trip leasing arrangements liable to the public for any damages caused on such trips, and accordingly is not unenforceable as contrary to public policy.

11. The indemnification clause in the September 30, 1983, trip lease agreement is valid and enforceable against Juillerat to the extent of requiring Juillerat to indemnify Transamerican for any judgment executed against it in this case, and for any and all expenses, including attorney fees, incurred in order to save harmless Transamerican from the claims of the Plaintiff herein.

Accordingly, the judgment entered on July 10, 1987, is ordered amended such that judgment is ordered entered in favor of

Plaintiff and against Defendants Juillerat *and* Transamerican, jointly and severally, in the amount of $550,000, plus interest thereon against Juillerat at the prevailing rate of interest from this date.[1] Judgment is also ordered entered in favor of Transamerican and against Juillerat on Transamerican's Cross Claim declaring that Juillerat shall indemnify Transamerican for any monies paid in execution of judgment in this case and for any expenses, including attorneys fees, incurred in defending this action. Finally, pursuant to the agreement of counsel for Juillerat and his insurer, judgment is ordered entered in favor of Plaintiff and against Juillerat for interest on $550,000 at the prevailing rate for post-judgment interest awards (7.00 percent per annum) for the period from June 29, 1987 to July 7, 1987 (i.e., the period of delay caused by Juillerat's last request for a continuance).

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

---

1. Interest against Transamerican began to run as of the date of this Court's previous Entry of Judgment (Doc. # 64), July 10, 1987. Because only by this Opinion has judgment also been ordered entered against Juillerat on Plaintiff's Complaint, interest as against Juillerat can only begin to run as of the entry of judgment on Juillerat's joint and several liability with Transamerican. Juillerat, however, under the indemnification clause the Court has found enforceable, may ultimately be liable to Transamerican for any interest it is required to pay Plaintiff from the aforesaid July 10, 1987.