Laymon YEARY and Emma
Yeary, Plaintiffs,

v.

UNITED STATES of America, Department of the Army, State of Indiana, and Indiana National Guard, Defendants.

No. IP 93–1581–CH/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 21, 1996.

Michael E. Morken and Bruce Jones, Austin Jones & Morken, Indianapolis, Indiana, for plaintiffs.

Thomas E. Kieper, Office of the United States Attorney, Indianapolis, Indiana, for defendant United States of America, Department of the Army.

David F. Hurley and Michelle Larock, Office of the Attorney General, for defendants State of Indiana and the Indiana National Guard.

## ENTRY ON DEFENDANT'S SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

Plaintiff Laymon Yeary and his wife Emma Yeary brought this action seeking damages for injuries resulting from a fall that Mr. Yeary suffered while undergoing police training at Camp Atterbury in Indiana. Camp Atterbury is owned by the United States but has been licensed to the State of Indiana for many years. Plaintiffs originally sued both the United States and the State of Indiana for negligence. The United States moved for summary judgment on the ground that it and its employees had no control over the allegedly dangerous premises. The State of Indiana moved for judgment on the pleadings based on the Eleventh Amendment to the United States Constitution. On July 12, 1995, this court issued an opinion dismissing for lack of subject matter jurisdiction the plaintiffs' claims against the State of Indiana. The Eleventh Amendment bars this court from exercising jurisdiction over those claims. In the same opinion, the court denied the motion for summary judgment filed by the United States. The United States then filed a supplemental motion for summary judgment raising an issue that had not been raised directly in briefing on the original motion. The supplemental motion does not rely on any evidence in addition to that submitted on the original motion. For the sake of clarity, the court will include some portions of its prior decision on the United States' earlier motion for summary judgment.

## Factual Background

For purposes of both the original and supplemental motions for summary judgment, the following facts are undisputed except where indicated otherwise. Plaintiff Laymon Yeary was a member of the Indianapolis Police Department (IPD). On December 8, 1992, he attended a training program for members of IPD's Special Weapons And Tactics team (SWAT) at Camp Atterbury in Johnson County, Indiana. Mr. Yeary was injured when he fell from the concrete landing and steps of Building 511 at Camp Atterbury after attending a SWAT team instructional session. Mr. Yeary's complaint alleges that the concrete landing and steps at the north door of Building 511 were negligently designed, built, and/or maintained.

Plaintiffs and the United States dispute whether plaintiffs can establish that the United States had "control" over the premises on December 8, 1992, for purposes of Indiana law of premises liability. The United States owns Camp Atterbury. Under a series of license agreements, the first of which took effect on April 1, 1969, the United States has licensed the premises to the State of Indiana for use by the Indiana National Guard. The operative paragraph of the license in effect on December 8, 1992, states:

The SECRETARY OF THE ARMY hereby grants to the State of Indiana, hereinafter referred to as the licensee, a license for an indefinite period beginning 1 December 1988 but revocable at will by the Secretary of the Army, to use and occupy for year-round training and support of the Indiana National Guard, certain land and improvements comprising a portion of Atterbury Reserve Training Area MILITARY RESERVATION, Indiana....

The license then includes several conditions that are central to the parties' respective arguments. The United States focuses on Paragraph 2, which imposes on Indiana the duty to "maintain and keep in good repair and condition the premises...." Plaintiffs focus on several provisions in which the United States reserved certain rights.

Paragraph 1 states that Indiana's use and occupancy "shall be under the general supervision and subject to the approval of the Secretary of the Army or his duly authorized representative and subject also to such rules and regulations as he may from time to time prescribe." In Paragraph 3, the United States reserves the right to use the property where deemed "necessary in the interest of national defense." Paragraph 6 states that "no addition to or alteration or improvement of the premises shall be made without prior written authorization from the Secretary of the Army or his duly authorized representative," but that all "additions, alterations and improvements so authorized shall be maintained by the licensee in good repair and condition." Paragraph 8 refers to a joint survey of the property undertaken by representatives of both the United States and Indiana. Paragraph 12 permits Indiana to issue licenses to "nonprofit community service type activities" to use the premises "upon concurrence of the Director" of the National Guard Bureau, which is a federal agency.

The concrete steps and landing at Building 511 had been cast in place in 1977. Renovations to the concrete steps and doorway were done in March 1991. The renovations were done by agents of the State of Indiana and at State expense. The undisputed facts show that the United States did not authorize any modifications to Building 511 and that no personnel under the command of the federal government had an active role of any kind in the renovation project.

In December 1992, the Indiana National Guard was not in national service and was under the command and control of the Adjutant General of Indiana and ultimately the Governor of the State of Indiana. The Indianapolis Police Department was allowed to use Camp Atterbury facilities for the training Mr. Yeary attended pursuant to a permit issued exclusively by the Military Department of the State of Indiana. There is no evidence that the United States was involved in approving the permit for IPD to use the facility.

To counter the defendants' evidence tending to show the United States lacked control over the premises, plaintiffs have offered evidence concerning the role of federal funds and federally funded employees in the Indiana National Guard. For example, the Adjutant General of Indiana testified that he considers the Indiana National Guard to be part of the federal government, at least in the sense that its soldiers are paid through federal funds when they are being trained. The federal government provides approximately 94 percent of the funds for the Indiana National Guard. Construction and maintenance costs for Camp Atterbury are ultimately reimbursed by the United States.

Some Indiana National Guard personnel are "technicians," who are employees of the United States under 32 U.S.C. § 709, or Active Guard Reserves. The working group responsible for maintenance at Camp Atterbury included at least a Major McGowen, Captain Kenneth Newlin, Lieutenant Carl Farley, and a Master Sergeant Erck. The group also may have included a Colonel Oshner, a Lieutenant Colonel Fowler, and/or a Major Liebrandt. McGowen, Newlin, Liebrandt, and Farley were "technicians." Oschner, Fowler, and Erck were Active Guard Reserves. However, at all times relevant here, all such personnel were under the command of the Adjutant General, who reports to the Governor of Indiana unless and until the President of the United States activates the Indiana National Guard for national service.

Plaintiffs offer evidence that Dan Yelch, an employee of the United States Army Corps of Engineers, had responsibility for Camp Atterbury. Mr. Yelch was the Army representative who participated in the 1988 joint survey of the property reflected in Paragraph 8 of the license. Plaintiffs also rely on various forms of federal oversight of the Indiana National Guard through the federal National Guard Bureau, which conducts inspections and promulgates various building codes and other regulations.

Plaintiffs also contend that the United States derives a financial benefit when outside groups, like the IPD, use the facilities at Camp Atterbury. They rely on an affidavit from an accountant for the City of Indianapolis stating that the city made checks payable

to the United States Treasury in order to pay for IPD's use of Camp Atterbury for the training session at which Mr. Yeary was hurt. The United States has responded with an affidavit from Carl H. Farley, a budget analyst for the Indiana National Guard, explaining that fees for non-military uses of the facilities are paid to the United States Treasury (through the National Guard Bureau) and are then paid back to the Indiana National Guard through the Indiana National Guard Camp Atterbury budget allotment.

## Liability Under the Federal Tort Claims Act

■ The Federal Tort Claims Act provides for tort liability against the United States "in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. The relevant jurisdictional statute provides that the government may be held liable for injuries arising from the "negligent or wrongful act or omission of any employee of the Government ... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Mr. Yeary's fall and the alleged negligence occurred in Indiana, so Indiana tort law applies to this case. *Davis v. United States,* 716 F.2d 418, 423 (7th Cir.1983).

■ Under Indiana law, whether a defendant is liable for injuries resulting from the condition of premises depends on the degree of the defendant's control of the premises. *McFeely v. United States,* 700 F.Supp. 414, 421 (S.D.Ind.1988); *St. Casimir Church v. Frankiewicz,* 563 N.E.2d 1331, 1333–34 (Ind.App.1990). For example, where an owner leases property and gives the lessee "full control and possession" of the property, the owner generally will not be liable for injuries sustained by the tenant or third parties on the property. *Dickison v. Hargitt,* 611 N.E.2d 691, 694 (Ind.App.1993). "Liability is imposed upon the person who controls the property because only the party who controls the land can remedy a hazardous condition existing upon it, and only the party who controls the land has the right to prevent others from coming onto it." *St.*

*Casimir Church,* 563 N.E.2d at 1333–34, citing *City of Bloomington v. Kuruzovich,* 517 N.E.2d 408, 411 (Ind.App.1987). The issue in this case, therefore, is whether there is a genuine issue of material fact as to whether the United States maintained sufficient control over Camp Atterbury so that it should be held responsible for injuries to visitors caused by allegedly dangerous or defective conditions in buildings.

Plaintiffs have offered essentially four theories for holding the United States responsible for Mr. Yeary's fall: (1) by the terms of its license of Camp Atterbury to the State of Indiana, the United States reserved sufficient control over the property so that it is liable for the fall; (2) an employee of the Army Corps of Engineers had sufficient control over the premises to establish liability; (3) the United States derived financial benefit from IPD's use of Camp Atterbury; and (4) the working group responsible for repairs and maintenance at Camp Atterbury included federal employees whose negligence caused Mr. Yeary's injuries.

In the earlier opinion, the court rejected the first theory because, under the terms of the license to the State of Indiana, the United States did not retain the kind of day-to-day control over the property necessary to establish premises liability under Indiana law. See, *e.g., St. Casimir Church,* 563 N.E.2d at 1333–34. In addition, the federal government's funding and regulatory oversight were not enough to establish federal "control" over the premises. See *United States v. Orleans,* 425 U.S. 807, 815–16, 96 S.Ct. 1971, 1976–77, 48 L.Ed.2d 390 (1976) (federal funding and regulatory oversight not sufficient to render United States liable for alleged negligence of community action agency); *Tisdale v. United States,* 838 F.Supp. 592, 597–99 (N.D.Ga.1993) (federal government not liable for injuries caused by dangerous condition of house owned by federal agency but managed by contractor), *aff'd,* 62 F.3d 1367 (11th Cir.1995). The court rejected plaintiffs' second theory based on the role of an employee of the Corps of Engineers who inspected the buildings at Camp Atterbury as part of an inventory four years before Mr. Yeary's fall. The plaintiffs failed to

come forward with evidence from which a finder of fact could reasonably conclude that any alleged negligence by the Army Corps of Engineers employee was a proximate cause of Mr. Yeary's fall. The court rejected plaintiffs' third theory based on undisputed evidence showing that the United States did not in fact benefit financially from the IPD's use of Camp Atterbury.

The court relied on plaintiffs' fourth theory of liability to deny the United States' original motion for summary judgment. Plaintiffs contend that Mr. Yeary's fall was caused by the negligence of an ad hoc working group responsible for planning and carrying out maintenance and repair activities at Camp Atterbury. For purposes of the United States' motion, that alleged negligence is presumed to have occurred. Although the record does not indicate the precise membership of the working group at the relevant time, it does indicate that the working group had as members both "Active Guard Reserves" and National Guard "technicians" employed under 32 U.S.C. § 709. The United States points out that at the relevant time, all these personnel were under the command of the Indiana National Guard (and ultimately the Governor of Indiana) rather than the command of the United States Army (and ultimately the President of the United States). Thus, the question here is whether the United States may be held liable for their negligence even if they were under State command rather than federal command at the time.

The dual federal-state role of the National Guard has caused difficulty under the Federal Tort Claims Act for some time. In *Maryland v. United States,* 381 U.S. 41, 85 S.Ct. 1293, 14 L.Ed.2d 205 *vacated on other grounds,* 382 U.S. 159, 86 S.Ct. 305, 15 L.Ed.2d 227 (1965), an Air National Guard pilot had negligently caused a fatal mid-air crash with an airliner. The pilot was an officer of the state Air National Guard and was employed by the Guard under a prior version of 32 U.S.C. § 709 as a "caretaker" of Guard property. The Supreme Court noted

that military members of the National Guard had long been deemed state employees for purposes of the FTCA, 381 U.S. at 45 n. 5 & 48, 85 S.Ct. at 1297 n. 5 & 1298, and held that civilians employed under 32 U.S.C. § 709 should also be treated as state employees and not federal employees for purposes of the FTCA, *id.* at 52–53, 85 S.Ct. at 1299–1300. If *Maryland v. United States* were the last word on the subject, the United States would certainly be entitled to summary judgment here. However, recognizing that its holding would leave victims of a fatal air-to-air collision without redress, the Court invited further consideration of the problem by Congress. *Id.* at 53, 85 S.Ct. at 1300.

Congress responded by enacting the National Guard Technicians Act of 1968 P.L. 90–486, which amended 32 U.S.C. § 709.[1] Even prior to that Act, technicians had been paid with federal funds and had been required to meet federal standards for mental and physical capacity and professional qualifications, and some had received federal retirement benefits. The 1968 Act modified the status of the "technicians" so as to provide federal retirement and employment benefits for all technicians. At the same time, the Act also ensured that the adjutants general of the States would retain command over the technicians. By asserting both entitlement to federal benefits and State supervision over National Guard technicians, the Act could seem merely to confuse the issue of whether technicians are considered federal employees for purposes of the FTCA. However, the National Guard Technicians Act expressly provided that technicians are federal employees. See 32 U.S.C. § 709(d). This label presumably applies for all purposes. Moreover, the legislative history of the National Guard Technicians Act makes explicit the intention of Congress to treat such technicians as federal employees *for purposes of the FTCA,* notwithstanding the fact that these technicians would be under command of State officers. The report of the House Committee on Armed Services

---

1. In addition, in 1981 Congress amended the FTCA to include in the definition of "employee of the government" members of the National Guard while engaged in federal training or duty. P.L. 97–124, amending 28 U.S.C. § 2671. That statute does not control here because no Indiana National Guard personnel were engaged in federal training or duty at any time relevant here.

stated that one purpose of the bill, "In authorizing Federal employee status for the National Guard technicians," was: "To clarify the technician's legal status which in certain areas has been the subject of conflicting court decisions, especially on the matter of whether technicians are covered under the Federal Tort Claims Act regarding third party actions against the U.S. Government." H.R.Rep. No. 1823, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 3318, 3319. Additional references in the committee report repeated the intention to treat the technicians as federal employees for purposes of the FTCA. See id. at 3319, 3324, 3325. See also American Fed. of Gov't Employees, AFL–CIO, Local 2953 v. Federal Labor Relations Auth., 730 F.2d 1534, 1543 n. 7 (D.C.Cir.1984) (discussing legislative history of National Guard Technicians Act of 1968).

■ Pursuant to the National Guard Technicians Act of 1968 then, the technicians who were part of the working group responsible for maintenance at Camp Atterbury—McGowen, Newlin, Liebrandt, and Farley—were federal employees for the purposes of the FTCA. The United States originally had moved for summary judgment on the basis that it did not have control over the maintenance of Camp Atterbury. Because technicians responsible for maintenance there were federal employees for purposes of the FTCA, this court denied the original motion for summary judgment filed by the United States.

### Effect of "Borrowed Servant" Doctrine on Liability

■ In its supplemental motion for summary judgment, the United States argues that the "borrowed servant" doctrine in Indiana law prevents the United States from being held liable for the actions of the "technician" personnel under the command and control of the Indiana National Guard. Like most states, Indiana recognizes that "an employee while generally employed by one party, may be loaned to another in such a manner that the special employer may be responsible for the acts of the employee under the doctrine of respondeat superior." New York Central R.R. Co. v. Northern

Indiana Pub. Serv. Co., 140 Ind.App. 79, 221 N.E.2d 442, 446 (1966). Indiana courts have articulated three standards to determine when an employee has been "borrowed" so as to affect liability questions. Courts generally consider (1) "whose business" the employee was furthering at the time of the negligence; (2) which employer had the right to "control" the specific act in question; and (3) whether the employee's work was within the scope of the borrowing employer's business. Progressive Constr. & Eng'g Co. v. Indiana & Michigan Elec. Co., 533 N.E.2d 1279, 1284 (Ind.App.1989); see generally New York Central R.R. Co., 140 Ind.App. 79, 221 N.E.2d at 447 (describing these principles as "deceivingly simple").

■ Although the articulation of these tests implies that courts must choose between the two employers in allocating respondeat superior liability, Indiana law provides for the possibility of both employers being liable for the negligence of "borrowed servants." Johnson v. Motors Dispatch, Inc., 360 N.E.2d 224, 228–29 (Ind.App.1977); New York Central R.R. Co., 221 N.E.2d at 446, 451 (citing Restatement (Second) of Agency § 226 (1958)). It has been said that the borrowed servant doctrine relieves the original employer of liability if its employees' service to the borrowing employer necessarily involves the abandonment of their service to the original employer. New York Central R.R. Co., 221 N.E.2d at 446; Logestan v. Hartford Steam Boiler Inspection and Ins. Co., 626 N.E.2d 829, 836 (Ind.App.1993) (Robertson, J., dissenting); Restatement (Second) of Agency § 226 (1958).

■ The United States bases its "borrowed servant" argument on the language of the FTCA provision that actually imposes liability on the United States for some of its employees' torts: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674 (emphasis added). The government's argument is straightforward. It argues that under Indiana law, the borrowed servant

doctrine would deem the federally employed technicians to have been "borrowed" by the State of Indiana, such that a private employer in the United States' position would be able to avoid liability. Ergo, says the United States, it cannot be held liable for the alleged negligence of its technicians "borrowed" by the Indiana National Guard. See generally *Green v. United States,* 709 F.2d 1158, 1162 & n. 3 (7th Cir.1983) (applying Wisconsin law, majority held that borrowed servant doctrine did not prevent United States from being liable under FTCA); *Garcia v. United States,* 62 F.3d 126, 127 (5th Cir.1995) (holding that whether a federal employee was acting within the scope of his employment is controlled by law of state where tortious conduct occurred). Cf. *Quilico v. Kaplan,* 749 F.2d 480, 483 (7th Cir.1984) (whether person is a government employee or an independent contractor is a question of federal law).

Would the borrowed servant doctrine under Indiana law relieve the United States of liability if it were a private employer here? As Justice Hunter wrote in *New York Central R.R. Co.,* the stated tests are "deceivingly simple," 221 N.E.2d at 447. His opinion quotes Justice Cardozo, who wrote in 1921: "The law that defines or seeks to define the distinction between general and special employers is beset with distinctions so delicate that chaos is the consequence. No lawyer can say with assurance in any given situation when one employment ends and the other begins. The wrong choice of defendants is often made, with instances all too many, in which justice has miscarried." Cardozo, *A Ministry of Justice,* 35 Harv.L.Rev. 113, 121 (1921). Commenting in 1966, Justice Hunter said that with the passage of time, "few aspects of this area of case law have changed except that the state of the law might be correspondingly more confusing." 221 N.E.2d at 447. A more recent scholarly survey of the common law has come to the same conclusion, reflected in the author's title. J. Dennis Hynes, *Chaos and the Law of Borrowed Servant: An Argument for Consistency,* 14 J.L. & Com. 1 (1994) ("no improvement has been made" since Justice Cardozo's comment).

The immediate causes for this chaos are fairly evident, even if a compelling basis for rationalizing the law in this area is not. What is called the "borrowed servant" doctrine comes into play in a variety of contexts, and the consequences of its application for the parties differ dramatically. In worker's compensation cases, the issue is ordinarily who is responsible for paying worker's compensation benefits for an injured worker. See, *e.g., Motor Dispatch, Inc. v. Snodgrass,* 157 Ind.App. 591, 301 N.E.2d 251, 254 (1973) (affirming award holding both "general" and "borrowing" employers liable for benefits to survivors of deceased employee); *Long v. Sims Motor Transp. Lines,* 124 Ind.App. 504, 117 N.E.2d 276, 277–78 (1954) (both employers could be held to have "controlled" employee and could be held liable for worker's compensation benefits). But in tort cases brought by an employee injured by the negligence of a "co-worker," the issue may arise in terms of whether the injured employee's claim against one "employer" (or perhaps both) is barred by the exclusive remedy provisions of the worker's compensation system.

In tort cases brought by third parties who have been injured by an employee's negligence, the issue may arise in terms of whether the injured person may obtain relief under principles of *respondeat superior* from one employer, the other, or both. See, *e.g., Johnson v. Motors Dispatch, Inc.,* 172 Ind. App. 285, 360 N.E.2d 224, 228–29 (1977) (reversing summary judgment for general employer and holding that genuine issue of fact existed as to whether both general employer and special employer could be held liable for truck driver's negligence); *Sargent Paint Co. v. Petrovitzky,* 71 Ind.App. 353, 124 N.E. 881, 886 (1919) (affirming jury verdict finding special employer liable and general employer not liable for negligence of driver "loaned" to special employer). In other cases, the borrowed servant issue has arisen in applying indemnification agreements between general and special employers. See, *e.g., Progressive Const.,* 533 N.E.2d at 1284–85; *New York Central R.R. Co.,* 221 N.E.2d 442. With several distinct and sometimes conflicting legal standards available for application in these varied contexts where a finding that a "servant" has been "borrowed" may have

such different consequences for the parties, it is not surprising that the law is not easily predicted. See generally Hynes, *Chaos and the Law of Borrowed Servant*, 14 J.L. & Com. at 27–32 (discussing internal inconsistencies in Restatement (Second) of Agency, §§ 226 & 227 dealing with borrowed servant doctrine).

Despite this level of uncertainty, there is no doubt that Indiana courts would find that the State of Indiana had "borrowed" the National Guard technicians whose actions are in dispute in this case. Indiana focuses most often on what Professor Hynes calls the "spot control" test: "which employer had the right to control the specific act in question." *New York Central R.R. Co.*, 221 N.E.2d at 448–49 (noting Indiana has adopted the "control" and "whose business" tests). Accord, *Loehrlein v. Floyd Staub, Inc.*, 150 Ind.App. 598, 276 N.E.2d 865, 868–69 (1971) (approving jury instruction focused on control of "the specific actions which resulted in this accident"); *Standard Oil Co. v. Soderling*, 112 Ind.App. 437, 42 N.E.2d 373, 377 (1942) (liability rests upon the employer who has the power to control and direct the servant in the performance of the particular work). The undisputed facts here show that the National Guard technicians responsible for planning and carrying out maintenance at Camp Atterbury were under the command and control of the Adjutant General of Indiana in carrying out those duties. In carrying out their responsibilities for maintaining and repairing Camp Atterbury, the technicians were furthering the business of the State of Indiana. Their work was also within the scope of the business of the State of Indiana. Thus, notwithstanding the technicians' status as federal employees, the borrowed servant doctrine as applied by Indiana courts would treat the State of Indiana as a borrowing or special employer.

But that conclusion does not resolve the United States' motion for summary judgment. The Indiana courts have repeatedly held that both a general employer and a borrowing employer may be held liable as employers in the same case and for the same purpose. Would the Indiana courts allow the United States, as the "general" employer of the National Guard technicians, to escape liability for their negligent acts? The Indiana cases arise in factual contexts very different from the one presented here. The borrowed servant issue arises most often when a business temporarily needs specialized equipment and personnel with special skills to operate that equipment, and contracts with another business for the use of the equipment and personnel to accomplish the "borrowing" employer's purposes. *E.g.*, *Loehrlein*, 276 N.E.2d at 866 (crane operator assisting contractor demolishing old highway); *New York Central R.R. Co.*, 221 N.E.2d at 446 (crane operator for repair of railroad tracks). In another common scenario in the Indiana cases, a truck driver carried a backhaul shipment for another trucking company in order to avoid a deadhead trip. *E.g.*, *Johnson v. Motors Dispatch, Inc.*, 172 Ind.App. 285, 360 N.E.2d 224, 225 (1977); *Jackson Trucking Co. v. Interstate Motor Freight Sys.*, 122 Ind.App. 546, 104 N.E.2d 575, 576–77 (1952).

None of the Indiana cases involve a relationship readily comparable to the relationship between the United States Army and the State militias. Under the National Guard Technicians Act, the contemplated "loan" of technicians is a long-term arrangement, not merely a temporary assignment. The "lending" employer does not lend the technicians to make a profit but does so to help ensure that the State National Guard maintains a sufficient state of military readiness to fulfill its role in a military that includes both regular Army and National Guard units. The Army and the State National Guards are not in different businesses but ultimately the same "business," serving a common public purpose of national defense. The terms of the National Guard Technicians Act, which provide federal employment of technicians for some purposes, including employee benefits and the FTCA, while ensuring that day-to-day control and hiring and firing decisions are left in the hands of the States' adjutants general, reflect compromises struck by Congress in maintaining one of the oldest balances in our federalist system: the balance between a federal army and State militias.

Translation of state law of borrowed servants from its own origins to this unique context is not easy. The Indiana cases dealing with the prospect of dual liability appear to give considerable weight to the general employer's usual ability to hire and fire the employee, even where the employee has been "loaned" to another employer. See *Wabash Smelting, Inc. v. Murphy,* 134 Ind.App. 198, 186 N.E.2d 586, 592 (1962); *Long v. Sims Motor Transp. Lines,* 117 N.E.2d at 277–78; *Jackson Trucking Co.,* 104 N.E.2d at 575. In this case, the ad hoc working group at Camp Atterbury was under the command and control of the Indiana Adjutant General. The Indiana Adjutant General also had the power (albeit by virtue of *federal* law) to discipline or fire those technicians. 32 U.S.C. § 709(e). The reasoning of these cases suggests the United States could avoid liability for these technicians' acts under Indiana law. However, the Indiana cases have also approved language in the Restatement (Second) of Agency § 226 to the effect that a person may be the servant of two masters at one time as to one act, "if the service to one does not involve abandonment of the service to the other." See *New York Central R.R. Co.,* 221 N.E.2d at 446; *Logestan,* 626 N.E.2d at 836 (Robertson, J., dissenting). It really cannot be said that the National Guard technicians have "abandoned" their service to the federal government. They continue to receive employment benefits and they remain on call to serve the federal government on virtually a moment's notice. The federal government funds their work and provides employment benefits in order to assist the states and to keep the state National Guards at the desired level of readiness to assist the federal army.

If the task were simply to find the best possible fit between Indiana borrowed servant doctrine and the facts of this case, the weight of Indiana case law would favor the United States' view. The lack of day-to-day control of the specific acts at issue and the state's power to hire, fire, and discipline, notwithstanding the lack of any "abandonment" of federal employment would support the United States' position. However, the truly central task here is to interpret and apply the statutes enacted by Congress.

Most relevant to that task are the terms and express purpose of the National Guard Technicians Act, applied in light of the extraordinarily poor "fit" between the chaotic borrowed servant doctrine and the unique relationship between the United States Army and the State National Guard with respect to these technicians. Indiana (and other states) developed the law of borrowed servants to deal with temporary relationships between general and special employers that simply are not comparable to the long-term relationship that exists between United States Army and State National Guards for mutual benefit and achievement of the common purpose of national defense.

Application of the borrowed servant doctrine to National Guard technicians would be contrary to both the National Guard Technicians Act of 1968 and the Federal Tort Claims Act. A central purpose of the National Guard Technicians Act was to make the technicians federal employees for purposes of the FTCA. That purpose is clear, even though the National Guard Technicians Act provides, as a matter of federal law and policy, that those employees will act under state control (and would therefore virtually always qualify as "borrowed servants"). The language of 32 U.S.C. § 709 expressly provides that the technicians will be under the command and control of State National Guards in their day-to-day work. The statute provides that the Secretary of the Army or Air Force "shall designate the adjutants general ... to employ and administer the technicians authorized by this section." 32 U.S.C. § 709(c). The statute further provides that the adjutant general may discharge technicians for cause and that any right of appeal "shall not extend beyond the adjutant general of the jurisdiction concerned." 32 U.S.C. § 709(e); see also 1968 U.S.C.A.A.N. at 3330 (detailing supervisory authority of adjutants general). Notwithstanding that extensive state control provided in the same Act, Congress chose to treat these technicians as federal employees for purposes of the FTCA.

The United States does not disagree with the last point. It acknowledges that the technicians are federal employees for pur-

poses of the FTCA, at least for purposes of taking advantage of the personal immunity provisions of 28 U.S.C. § 2679(b)(1). That provision gives personal immunity to federal employees for torts committed while acting within the scope of their (presumably federal) employment. But the United States also contends that it is entitled to invoke the borrowed servant doctrine to avoid tort liability for negligence of these federal employees acting under State control. If that were true, the borrowed servant doctrine would virtually always apply to technicians by virtue of the extent of State control. That result would have a distinct flavor of "heads I win, tails you lose," for the negligent federal employees would be treated as federal employees to benefit from immunity but the federal government would not be treated as their employer for purposes of liability.

The FTCA may well produce such results in some other contexts, but in this case, if the United States is correct, the result would be a roundabout return to the result of *Maryland v. United States:* no federal remedy for victims of National Guard technicians' negligence. That result would be contrary to the National Guard Technicians Act of 1968 because Congress deliberately designated technicians as federal employees for purposes of the FTCA to clarify their legal status and provide federal remedies for victims of their negligence, even though the technicians would virtually always qualify as "servants borrowed" by the States. In enacting the National Guard Technicians Act, Congress chose as a matter of federal law and policy to embrace *both* federal responsibility for technicians under the FTCA *and* State control over the technicians' day-to-day activities. To apply the borrowed servant doctrine here would effectively nullify that important aspect of the National Guard Technicians Act of 1968. The court therefore concludes that the better interpretation of the applicable statutes is that the United States may not invoke the borrowed servant doctrine to avoid liability for negligence of National Guard technicians in this case.

### Conclusion

Plaintiffs have come forward with evidence showing that those persons they claim negli-gently caused Mr. Yeary's injury were federal employees acting within the scope of their employment. Indiana's borrowed servant doctrine is not applicable to these National Guard technicians, for Congress has provided that the federal government should be responsible for torts committed by such federally employed technicians even where the technicians act under the command and control of a State government. The United States' supplemental motion for summary judgment is therefore DENIED.

So ordered.